**IN THE UNITED STATED DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CALEB NDEDA CHOGO, an Employee of the United States Government or an Employee of a Contractor for the United States Government

STEPHEN MACHARIA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

SAMUEL M NJUGUNA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

ANNE ODINGA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

CANCILDE R. UMULISA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

GEETA N. SHAH, an Employee of the United States Government or an Employee of a Contractor for the United States Government

FREDRICK ALARO, an Employee of the United States Government or an Employee of a a Contractor for the United States Government

**COMPLAINT**

**Civil Action No.**

DANIEL AMAPANGA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

RENSON M. ASHIKA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

PHILIPS ASUSA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

PELAGIA K. BUBERWA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

ANTHONY CHEGE, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

JOSEPH THAIRU GATHECA, an Employee of
the United States Government or an Employee of
a Contractor for the United States Government

JOSEPH GITHOGORI, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

PETER MAINA JOSEPH, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

RAMADHAN KIMANI JUMA, an Employee of
the United States Government or an Employee of
a Contractor for the United States Government

JAMES KANJA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

MONICA KAPILIMA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

JOHN KABI KIBE, son of FRANCIS KIBE, an
Employee of the United States Government or
an Employee of a Contractor for the
United States Government, deceased

JEMIMAH KILI, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

PETER KILONZI, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

DAVID KIMANI, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

LUKA MWALE LITWAJI, an Employee of the United States Government or an Employee of a Contractor for the United States Government

PHANUEL MACLUS, an Employee of the United States Government or an Employee of a Contractor for the United States Government

ESTHER J. MASABALA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

TAITORO MASANGA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

ROBERT MATHEKA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

MATHEW M. MBITHI, an Employee of the United States Government or an Employee of a Contractor for the United States Government

PATRICK MUTUKU MAWEU, an Employee of the United States Government or an Employee of a Contractor for the United States Government

RICHARD MAWEU, an Employee of the United States Government or an Employee of a Contractor for the United States Government

GEORGIA MHOMA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

PRISCA AKUMU MIMBA, mother of GEORGE M. MIMBA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

JUDITH AKINYI MIMBA, sister of GEORGE M. MIMBA, an Employee of the United States Government or an Employee of a Contractor for the United States Government

CHRISTINE AWINO MIMBA, sister of
GEORGE M. MIMBA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

FREDRICK OUSO MIMBA, brother of
GEORGE M. MIMBA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

HESBON OWIRO MIMBA, brother of
GEORGE M. MIMBA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

BEATRICE AKOTH MIMBA, sister of
GEORGE M. MIMBA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

ZABLON NYAMALO MIMBA, brother of
GEORGE M. MIMBA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

EDWIN OPIYO MIMBA, brother of
GEORGE M. MIMBA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

ERICA ACHIENG MIMBA, sister of
GEORGE M. MIMBA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

GEOFREY KAMAU MUNDIAH, an Employee
Of the United States Government or an Employee
of a Contractor for the United States Government

FRANCIS MUNYI, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

DUNCAN MUTIA MUSYOKA, an Employee of
the United States Government or an Employee of
a Contractor for the United States Government

THOMAS MUTUA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

PAUL MWANGI, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

THOMAS NDIBUI, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

LUCAS NDILE, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

MOHAMED NGWEGWE, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

STANLEY WAWERU NJAGI, an Employee
of the United States Government or an Employee
of a Contractor for the United States Government

FRANCIS NJAU, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

SILAS MURITHI NJIRU, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

FANUEL O. ONYANDO, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

GEORGE OPANGA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

ELVIS MURITHI SAMUEL, an Employee
of the United States Government or an Employee
of a Contractor for the United States Government

RICHARD KHAGULI SANYA, an Employee
of the United States Government or an Employee
of a Contractor for the United States Government

JUSTUS WAMBUA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

PETER WANYOIKE, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

JONAS ZEPHANIA, an Employee of the
United States Government or an Employee of
a Contractor for the United States Government

Plaintiffs,

vs.

REPUBLIC OF THE SUDAN
Ministry of External Affairs
People's Palace
Khartoum, Sudan

and

MINISTRY OF THE INTERIOR
OF THE REPUBLIC OF THE SUDAN
People's Palace
Khartoum, Sudan

and

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeini Avenue, United Nations Street
Tehran, Iran

and

THE IRANIAN MINISTRY
OF INFORMATION AND SECURITY
Pasdaran Avenue
Golestan, Yekom
Tehran, Iran

Defendants.

## INTRODUCTION

CALEB NDEDA CHOGO, et al., ("Plaintiffs"), file this lawsuit pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A or its predecessor law, 28 U.S.C. § 1605(a)(7), to the extent it continues to apply to this case, and related statutes. The lawsuit is brought to recover Plaintiffs' damages suffered as a result of the Sudanese and Iranian sponsored terrorist attacks upon the Embassies of the United States located at Dar es Salaam, Tanzania and Nairobi, Kenya on August 7, 1998.

The scope of potential plaintiffs in a lawsuit brought under 28 U.S.C. § 1605A, the new state sponsor of terrorism exception to foreign sovereign immunity, includes non-U.S. nationals if the "claimant or victim was at the time" of the terrorist bombing an "employee of the Government of the United States . . ." or "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ." 28 U.S.C. § 1605A(a)(2)(A)(ii).

## JURISDICTION AND VENUE

1. Jurisdiction in this Court arises pursuant to 28 U.S.C. §§ 1605A, 1330(a), 1331 and 1332(a)(2).

2. The Plaintiffs in this case are U.S. nationals and non-U.S. nationals who were, at the time of the bombings, either an "employee of the Government of the United States . . ." or "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ."

3. Subject matter jurisdiction is properly asserted under 28 U.S.C. § 1605A.[1]

4. While acting within the scope of their employment or office, agents, employees, and officials of the Islamic Republic of Iran (hereinafter referred to as "Iran") provided the technical know-how and tactical training that allowed Al Qaeda to build the bombs that destroyed the U.S. Embassies at Dar es Salaam, Tanzania, and Nairobi, Kenya. This qualifies as material support as defined under 28 U.S.C. § 1605A. Subject matter jurisdiction is properly asserted under 28 U.S.C. § 1605A. The Foreign Sovereign immunities Act provides that there "shall" be personal jurisdiction over a foreign state whenever there is subject matter jurisdiction over a claim for relief plus effective service of process. 28 U.S.C. § 1330(b).

5. While acting within the scope of their employment or office, agents, employees and officials of the Republic of the Sudan (hereinafter referred to as "Sudan" or "the Sudan") provided a broad range of critical support to Al Qaeda over a number of years without which Al Qaeda would never have been able to relocate from Afghanistan to Africa or grow into an organization capable of performing the attacks on the U.S. Embassies at Dar es Salaam, Tanzania, and Nairobi, Kenya. This qualifies as material support as defined in 28 U.S.C. § 1605A.

6. The provision of material support by Iran and the Sudan meets the requirements for subject matter jurisdiction established by 28 U.S.C. § 1605A as to the U.S. national and non-

---

[1] Hereinafter, subsequent references to 28 U.S.C. § 1605A are intended to encompass both 28 U.S.C. § 1605A and its predecessor law, 28 U.S.C. § 1605(a)(7), to the extent it continues to apply to this case. 28 U.S.C. § 1605A on its face creates subject matter jurisdiction for U.S. nationals and non-U.S. nationals who were "employee[s] of the Government of the United States" or were "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ." 28 U.S.C. § 1605A(a)(2)(A)(ii). 28 U.S.C. § 1605(a)(7) only creates subject matter jurisdiction for U.S. nationals.

U.S. national plaintiffs. Section 1605A allows non-U.S. nationals, if the claimant or the victim was an "employee of the Government of the United States . . .", or "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . ." to bring suit against the state-sponsors of terrorism who caused their personal injury or death. 28 U.S.C. § 1605A(a)(2)(A)(ii). All national and non-U.S. nationals were either an employee of the Government of the United States, an individual performing a contract awarded by the United States Government acting within the scope of the employee's employment, or a family member thereof.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

8. The causes of action contained in the six counts later enumerated in this Complaint are based upon the following sources of law:

a. a new federal private right of action under 28 U.S.C. § 1605A(c), which is available both to U.S. national and non-U.S. national Plaintiffs, and wherever the common or statutory law of a Plaintiff's residence contains rights or makes further damages available that are not duplicative of the recovery afforded under 28 U.S.C. § 1605A(c), as the Plaintiffs have causes of action under the common or statutory law of the U.S. state or foreign country where they were domiciled at the time of the attack;

b. for the non-U.S. nationals Plaintiffs, who do not possess a cause of action under 28 U.S.C. § 1605A, the common and statutory laws of the District of Columbia, Tanzania, or Kenya for wrongful death, solatium, loss of consortium, assault and battery, intentional infliction of emotional distress and survival, whether statutory or common law.

**THE PARTIES**

**PLAINTIFFS**

9. Plaintiff, CALEB NDEDA CHOGO, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

10. Plaintiff, STEPHEN MACHARIA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

11. Plaintiff, SAMUEL M. NJUGUNA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

12. Plaintiff, ANNE ODINGA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right.

13. Plaintiff, CANCILDE R. UMULISA, is a citizen of Tanzania and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Dar es Salaam, Tanzania. Plaintiff now brings this action in her own right.

14. Plaintiff, GEETA N. SHAH, is a citizen of the United States of America and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right.

15. Plaintiff, FREDRICK ALARO, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

16. Plaintiff, DANIEL AMAPANGA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

17. Plaintiff, RENSON M. ASHIKA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

18. Plaintiff, PHILIPS ASUSA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

19. Plaintiff, PELAGIA K. BUBERWA, is a citizen of Tanzania and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S.

Embassy at Dar es Salaam, Tanzania. Plaintiff now brings this action in her own right.

20. Plaintiff, ANTHONY CHEGE, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

21. Plaintiff, JOSEPH THAIRU GATHECA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

22. Plaintiff, JOSEPH GITHOGORI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

23. Plaintiff, PETER MAINA JOSEPH, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

24. Plaintiff, RAMADHAN KIMANI JUMA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

25. Plaintiff, JAMES KANJA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was

injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

26. Plaintiff, MONICA KAPILIMA, is a citizen of Tanzania and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Dar es Salaam, Tanzania. Plaintiff now brings this action in her own right.

27. Plaintiff, JOHN KABI KIBE, is a citizen of Kenya and is the son of the late FRANCIS KIBE, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

28. Plaintiff, JEMIMAH KILI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

29. Plaintiff, PETER KILONZI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

30. Plaintiff, DAVID KIMANI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

31. Plaintiff, LUKA MWALE LITWAJI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

32. Plaintiff, PHANUEL MACLUS, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

33. Plaintiff, ESTHER J. MASABALA, is a citizen of Tanzania and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Dar es Salaam, Tanzania. Plaintiff now brings this action in her own right.

34. Plaintiff, TAITORO MASANGA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

35. Plaintiff, ROBERT MATHEKA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

36. Plaintiff, MATHEW M. MBITHI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi,

Kenya. Plaintiff now brings this action in his own right.

37. Plaintiff, PATRICK MUTUKU MAWEU, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

38. Plaintiff, RICHARD MAWEU, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

39. Plaintiff, GEORGIA MHOMA, is a citizen of Tanzania and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Dar es Salaam, Tanzania. Plaintiff now brings this action in her own right.

40. Plaintiff, PRISCA AKUMU MIMBA, is a citizen of Kenya and is the mother of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

41. Plaintiff, JUDITH AKINYI MIMBA, is a citizen of Kenya and is the sister of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

42. Plaintiff, CHRISTINE AWINO MIMBA, is a citizen of Kenya and is the sister of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

43. Plaintiff, FREDRICK OUSO MIMBA, is a citizen of Kenya and is the brother of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

44. Plaintiff, HESBON OWIRO MIMBA, is a citizen of Kenya and is the brother of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

45. Plaintiff, BEATRICE AKOTH MIMBA, is a citizen of Kenya and is the sister of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

46. Plaintiff, ZABLON NYAMALO MIMBA, is a citizen of Kenya and is the brother of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August

7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

47. Plaintiff, EDWIN OPIYO MIMBA, is a citizen of Kenya and is the brother of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

48. Plaintiff, ERICA ACHIENG MIMBA, is a citizen of Kenya and is the sister of GEORGE M. MIMBA, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

49. Plaintiff, GEOFREY KAMAU MUNDIAH, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

50. Plaintiff, FRANCIS MUNYI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

51. Plaintiff, DUNCAN MUTIA MUSYOKA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S.

Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

52. Plaintiff, THOMAS MUTUA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

53. Plaintiff, PAUL MWANGI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

54. Plaintiff, THOMAS NDIBUI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

55. Plaintiff, LUCAS NDILE, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

56. Plaintiff, MOHAMED NGWEGWE, is a citizen of Tanzania and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Dar es Salaam, Tanzania. Plaintiff now brings this action in his own right.

57. Plaintiff, STANLEY WAWERU NJAGI, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S.

Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

58. Plaintiff, FRANCIS NJAU, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

59. Plaintiff, SILAS MURITHI NJIRU, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

60. Plaintiff, FANUEL O. ONYANDO, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

61. Plaintiff, GEORGE OPANGA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

62. Plaintiff, ELVIS MURITHI SAMUEL, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

63. Plaintiff, RICHARD KHAGULI SANYA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

64. Plaintiff, JUSTUS WAMBUA, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

65. Plaintiff, PETER WANYOIKE, is a citizen of Kenya and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right.

66. Plaintiff, JONAS ZEPHANIA, is a citizen of Tanzania and was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Dar es Salaam, Tanzania. Plaintiff now brings this action in his own right.

**DEFENDANTS**

67. Defendant, the **REPUBLIC OF THE SUDAN**, is a foreign state within the meaning of 28 U.S.C. 1391(f) and 1603(a).

68. SUDAN has been designated as a foreign state that sponsors terrorism within the meaning of 28 U.S.C. § 1605A, the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371.

69. SUDAN, through its officials, officers, agents and employees, provided material support and resources to Osama Bin Laden and Al Qaeda. The support provided by SUDAN to Osama Bin Laden and Al Qaeda assisted in or contributed to the preparation and execution of the plans that culminated in the U.S. Embassy bombings at Nairobi, Kenya, and Dar es Salaam, Tanzania, and the extrajudicial killing and/or injury of the Plaintiffs.

70. The Defendant, the **MINISTRY OF THE INTERIOR OF THE REPUBLIC OF THE SUDAN**, is an agency of Defendant, the Republic of the Sudan. Its activities at the time of this occurrence included the support of terrorist activities directed against foreign targets by terrorist groups operating with cover of the Republic of the Sudan.

71. Defendant, the **ISLAMIC REPUBLIC OF IRAN**, is a foreign state within the meaning of 28 U.S.C. §1391(f) and 1603(a).

72. IRAN has been designated as a foreign state that sponsors terrorism within the meaning of 28 U.S.C. § 1605A, the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371.

73. IRAN has been found to be liable as a state sponsor of international terrorism under 28 U.S.C. § 1605(a)(7), especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization known as "Hezbollah," in various cases before this court, including *Anderson v. the Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000), and *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998).

74. IRAN, through its officials, officers, agents and employees including the **ISLAMIC REPUBLIC OF IRAN MINISTRY OF FOREIGN AFFAIRS**, the **IRANIAN MINISTRY OF INFORMATION AND SECURITY ("MOIS")**, and the Iranian Revolutionary Guard Corps, provided material support and resources to Osama Bin Laden

and Al Qaeda both directly and through its surrogate, Hezbollah. The support provided by IRAN to Osama Bin Laden and Al Qaeda assisted in or contributed to the preparation and execution of the plans that culminated in the terrorist bombing of the U.S. Embassies at Nairobi, Kenya, and Dar es Salaam, Tanzania, and the deaths and injuries caused by those bombings.

75. Defendant, MOIS, is a political subdivision and/or agency of Defendant, the Islamic Republic of Iran. Its activities at the time of the bombing included the support of terrorist activities directed against foreign targets by terrorist groups operating with cover of the Islamic Republic of Iran.

## FACTS

### A. The History, Organization, and Function of Al Qaeda

76. In or about 1989, Osama Bin Laden, Muhammad Atef, and others founded an international terrorist group that became known as "Al Qaeda" ("the Base"). Osama Bin Laden was the "emir" (prince) of Al Qaeda and was its leader at all relevant times. Members of Al Qaeda pledged an oath of allegiance (called a "bayat") to Osama Bin Laden and Al Qaeda.

77. From 1989 until about 1991, Al Qaeda was headquartered in Afghanistan and in Peshawar, Pakistan. In or about 1991, the leadership of Al Qaeda, including Osama Bin Laden, relocated to the Sudan. Al Qaeda was headquartered in the Sudan from approximately 1991 until approximately 1996 but also maintained offices in various parts of the world. In 1996, Osama Bin Laden and other members of Al Qaeda relocated to Afghanistan.

78. Osama Bin Laden and Al Qaeda violently opposed the United States for several reasons. First, the United States was regarded as an "infidel" because it was not governed in a manner consistent with the Al Qaeda's extremist interpretation of Islam. Second, the United States was viewed as providing essential support for other "infidel" governments and institutions, particularly the governments of Saudi Arabia and Egypt, the nation of Israel, and the United Nations organization, which were regarded as enemies of Al Qaeda. Third, Al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, Al Qaeda opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) following the Gulf War. Fourth, Al Qaeda opposed the United States Government because of the arrest, conviction and imprisonment of persons associated with Al Qaeda or its affiliated terrorist groups or those with whom it worked. For these and other reasons, Osama Bin Laden declared "jihad," or holy war, against the United States, which he had carried out through Al Qaeda and its affiliated organizations.

79. Al Qaeda functioned both on its own and through terrorist organizations that operated under its umbrella, including, but not limited to: Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, and at times, the Islamic Group (also known as "el Gamaa Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including, but not limited to: the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia. Al Qaeda also maintained cells and personnel in a number of countries to facilitate its

activities, including in Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

80. Al Qaeda had a command and control structure which included a "majlis al shura" (or "consultation council"). The consultation council discussed and approved major undertakings, including terrorist operations.

81. Al Qaeda also had a "military committee" which considered and approved "military" matters.

82. Osama Bin Laden and Al Qaeda also forged alliances with the National Islamic Front in the Sudan, with representatives of IRAN, and its associated terrorist group Hezbollah, and with representatives of the government of IRAQ for the purpose of working together against their perceived common enemy in the West, the United States.

83. Since at least 1989, Osama Bin Laden and the terrorist group Al Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan. The camps were used to instruct members and associates of Al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train others in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of Al Qaeda about traveling to perform operations. For example, Al Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to

determine the effectiveness of their terrorist activities.

84. Since in or about 1996, Osama Bin Laden and others operated Al Qaeda from their headquarters in Afghanistan. During this time, Osama Bin Laden and others forged close relations with the Taliban and Muhammad Omar, the Taliban's supreme leader and Afghanistan's head of state from 1996 to late 2001. Osama Bin Laden openly informed other Al Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban and Muhammad Omar.

### B. The "fatwahs" and the "jihad" Terrorist Campaign Against Americans

85. One of the principal goals of Al Qaeda was to drive out by violence the United States armed forces from Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) and Somalia. These goals eventually evolved into a declaration of jihad against the United States and all Americans. Members of Al Qaeda issued "fatwahs" (rulings on Islamic law) indicating that such attacks on Americans were both proper and necessary.

86. At various times beginning in or about 1992, Osama Bin Laden, working together with members of the fatwah committee of Al Qaeda, disseminated fatwahs to other members and associates of Al Qaeda. These fatwahs directed that United States citizens be attacked and murdered.

87. On various occasions, Osama Bin Laden and other co-conspirators advised members of Al Qaeda that it was proper to engage in violent actions against "infidels" (nonbelievers), even if others might be killed by such actions, because if the others were "innocent," they would go to paradise, and if they were not "innocent," they deserved to die.

### C. The Sovereign Nation Defendants Furnished Critical Aid to Underwrite the Terrorist Conspiracy Against the United States

88. In furtherance of the conspiracy, the named Defendants committed the

following acts:

a. At various times from at least as early as 1989, Defendants and others, known and unknown, engaged in financial and business transactions on behalf of Al Qaeda, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of Al Qaeda and its associated terrorist organizations in various countries throughout the world.

b. At various times from at least as early as 1990, Defendants and their unknown co-conspirators provided military and intelligence training in various areas, including Afghanistan, Iraq, Iran, Pakistan, and the Sudan, for the use of Al Qaeda and its affiliated groups.

c. The government of the Sudan is run by President Field Marshall Omar Hassan al-Bashir, the head of state of the Sudan, through an alliance between the military and the National Congress Party, formerly the National Islamic Front.

d. In the early 1990s, the government of the Sudan sent overtures to Osama Bin Laden and Al Qaeda, inviting the group to relocate en mass from Afghanistan to the Sudan.

e. Jamal Ahmed Al-Fadl, a top Al Qaeda lieutenant who served Bin Laden in Afghanistan as well as the Sudan, went to the Sudan to secure residential and commercial property for Al Qaeda. The purpose of some of the property was to provide a safe place to train Al Qaeda militants.

f. During this trip, Al-Fadl learned of the impending relationship between Al Qaeda and the Sudanese government for the first time at one of the meetings in Peshwar, Pakistan

that occurred between the Sudanese government, Osama Bin Laden, and other Al Qaeda members. The representatives of the Sudanese government promised the support of that government should Al Qaeda come to the Sudan. Al Qaeda thereafter used Sudanese Airways planes to ferry anti-tank rockets and Stinger missiles from Afghanistan to the Sudan.

g. Essam Al Riddi, a pilot who worked for Bin Laden in 1993, stated that he purchased a plane for Bin Laden; oversaw its refurbishment; and flew it to Khartoum in 1993.

h. While Al Riddi stayed in Khartoum, he dined with Bin Laden and had several discussions with him. Bin Laden was staying in a large villa in Khartoum, with an office and a guesthouse. The Sudanese government provided security for Al Qaeda. Fifteen (15) to twenty (20) Sudanese men dressed in Sudanese army fatigues, using jeeps with Sudanese army license plates, were stationed at the villa.

i. Al Qaeda provided Al Riddi with a plane from Sudan Airlines to transport militants to Nairobi. Bin Laden discussed the possibility of Al Riddi transporting some Stinger missiles from Pakistan to the Sudan.

j. Bin Laden assured Al Riddi that the Sudanese and Pakistani intelligence agencies would cooperate with the weapons transfer.

k. The training that Al Qaeda employed in the Sudan included explosives training. The loud noises drew the attention of the local police after complaints from neighbors. Al Fadl was among those arrested. He was quickly released, due to the close relationship between Al Qaeda, and the Sudanese intelligence service, a Defendant in this action. According to Al-Fadl:

> [W]e call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that. And they take us to the jail, and they say you shouldn't do that, we tell you to refresh,[2] not to make real explosives.

k. Al-Fadl saw a letter from President al-Bashir that explained the relationship between Al Qaeda and Sudanese intelligence. With the explicit approval of Bin Laden, Al-Fadl also personally worked with the Sudanese intelligence officers.

l. The Sudanese intelligence officers and government officials, at all times, acted within the scope of their office or agency during the course of the activities described in this Complaint.

m. The intelligence officers were organized into a "delegation office" to meet the needs of the Al Qaeda group in the Sudan. There was an explicit fear that agents from foreign governments or informants would disclose Al Qaeda's location and activities in the Sudan. Al-Fadl would identify suspicious foreigners to the Sudanese intelligence as Al Qaeda sought to keep its presence and activities in the Sudan secret. Some of these informants were consequently jailed in the Sudan.

n. The delegation office, staffed with Sudanese intelligence officers, also helped provide security for Al Qaeda and facilitated the movement of weapons in and out of the country. On one particular trip, the weapons were taken out of the country by delivering four crates of weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army.

---

[2] "Refresh" meant refresher courses for the militants who had already received training in the past.

o. The letter from President al-Bashir was absolutely essential to the operations of the Al Qaeda terrorist group, which was secretly training in the Sudan. The letter allowed Al Qaeda members, such as Al-Fadl, to bypass tax and customs collection on international shipments and guaranteed their shipments, coming or going, would not be inspected.

p. Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by Sudanese armored and mechanized infantry. The letter would allow shipments from overseas to bypass inspection at a port and then travel back to Khartoum without inspection by the local police at the numerous checkpoints along the way.

q. The delegation office, the Sudanese government's intermediary with Al Qaeda, protected Al Qaeda members, such as Al-Fadl, from the interference of Sudanese immigration officials at the airport. The protection afforded by the delegation office was critical because if Al Qaeda members were caught abroad and their passports were stamped with Sudanese immigration markings, it would be clear to foreign agents where the organization was located.

r. Al Qaeda also set up companies that provided the organization with income so that it could continue its growth and evolution into a lethal organization with global reach. Al Qaeda, however, did not come to Sudan to operate as a regular capitalist enterprise. Rather, the purpose of the investment in Sudanese business activity was as an adjunct to its mission of aggression against the West, as explicitly stated by Bin Laden himself:

> . . . [O]ur agenda is bigger than business. We not going to make business here, but we need to help the government and the government help our group, and this our purpose.

s. The Sudanese companies founded by Al Qaeda include, but is not limited to: Laden International Company for import and export; Taba Investment for currency exchange; Hijra Construction Company, which built the largest road existing in Sudan; and the Al Themar al Mubaraka, which ran the farm where Al Qaeda trained its militants in explosives. The Hijra Construction Company purchased explosives for its road and bridge building activities.

t. Al Qaeda also had extensive holdings in Khartoum, including business offices, guesthouses, farms and residential houses. Bin Laden even had a bank account in Khartoum in his true name. Al Qaeda purchased some of the companies directly from the Sudanese government. The funding that these companies provided to Al Qaeda was critical to its survival and continued existence. In fact, as most of Al Qaeda's income was derived from this business activity, Al Qaeda's concern regarding the fluctuation of Sudanese currency was specifically discussed during a meeting in which Bin Laden was in attendance.

u. Al Qaeda's position regarding the United States was clear as early as 1992, when Bin Laden issued a fatwa against the United States due to its presence in the Gulf region during the First Gulf War and its actions in Somalia. The discussion surrounding the fatwa included an explicit allowance for the murder of innocent civilians. Al Qaeda provided support to groups in Somalia, Yemen, the Philippines, Tajikistan, and Pakistan, among others, for this very purpose.

v. The partnership forged with the Sudanese government derived benefits for both parties. The Sudanese government employed Al Qaeda to manufacture chemical weapons in a section of Khartoum, called Hilat Koko, for use against the rebels in southern Sudan. Al-Fadl traveled to the chemical weapons manufacturing area with a Sudanese military officer, who

explained the need for chemical weapons by the Sudanese government.

w. Al Qaeda also provided communications equipment and Kalishnikov rifles for the Sudanese army, founded by the Islamic National Front, to fight the Christian rebels in the south. Al-Fadl, as part of this arrangement, also worked directly for the Sudanese government. For example, a Sudanese intelligence officer who also worked in the immigration office approached Al-Fadl and asked him to spy on a government opposition leader. Al-Fadl arrested the opposition leader and tried to turn him away from his work against the Sudanese government. The Sudanese intelligence officer advised Al-Fadl to lie to the opposition leader, to tell him that Al-Fadl had quit Al Qaeda and had stopped working with the government. Al-Fadl reported back to the head of the delegation office; the group of Sudanese intelligence officers that protected Al Qaeda, facilitated communications with the Sudanese government, and provided logistical support.

x. Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in the Sudan.

y. Al Qaeda entered into a transaction to purchase uranium through the former President of the Sudan, currently an officer in the Sudanese army. The quality of the uranium was tested in Hilat Koko, the section of Khartoum where the government was partnered with Al Qaeda in the manufacture of chemical weapons. Al-Fadl discussed the uranium test with a member of the Sudanese government, whose brother "runs" the building where the chemical weapon manufacture was housed.

z. Without the material support, assistance, and aid provided by Sudanese government officials acting within the scope of their agency, employment or office, Al Qaeda could not

have carried out the United States embassy bombing at Nairobi, Kenya that caused the Plaintiffs' injuries. Such material support, assistance, and aid fits within the definition of material support as described in 18 U.S.C. § 2339A.

aa. The Defendants not only knew that Al Qaeda was attempting to conceal itself in the Sudan, but facilitated and furthered Al Qaeda's concealment through the activities of the Sudanese intelligence services. The scale of support that Defendants furnished Al Qaeda was substantial. The regime invited Al Qaeda to roost in the Sudan and knew of, at least from 1992 onward, Al Qaeda's anti-U.S. crusade.

bb. The then and current regime of Sudan explicitly allied itself with Al Qaeda for an illegal and unlawful purpose. The regime conspired with Al Qaeda in the manufacture of weapons and training of terrorists, all the while knowing of Al Qaeda's anti-U.S. crusade. The provision of support to a terrorist organization is illegal and unlawful. The explicit purpose of their agreement was to make each stronger. The U.S. Embassy bombing at Nairobi, Kenya greatly enhanced Al Qaeda's worldwide reputation and attracted money, recruits and support from those allied against the United States.

cc. At various times from at least 1990, IRAN has provided material support to Bin Laden and Al Qaeda, often through its state-sponsored terrorist organization, Hezbollah. That support included advice and assistance in planning attacks against American targets. Information was often shared and exchanged between Al Qaeda and IRAN.

dd. For many years, the United States Department of State has included IRAN among the *"state sponsors of terrorism."* Indeed, more than once in recent years, the Department of State has described IRAN as *"the most active*" among state sponsors of terrorism. The formation of Hezbollah and its emergence as a major terrorist organization

was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards and the Iranian Ministry of Information. The above-referenced activities of Hezbollah were financed, technologically supported and commanded by Iranian military/intelligence operatives.

ee. In October 2001, a Bin Laden operative, Ali Mohamed, confessed in a United States District Court in New York that he and senior Al Qaeda operatives met with Hezbollah security chief Imad Mughniyah who is believed to have carried out the bombings of the U.S. Embassy in Beirut and the Marine barracks in 1983.

ff. On many occasions, Bin Laden had praised the 1983 Beirut Marine barracks bombing conducted by Hezbollah and Iranian agents. Bin Laden sought out Hezbollah and their Iranian commanders for their tactical expertise for large scale operations. In 1993-1994, Al Qaeda operatives received specialized-explosives training in Lebanon from Hezbollah operatives.

gg. In June 1996, Iran's Ministry of Information and Security hosted a meeting of terrorist leaders in Tehran that included Imad Mughniyah and senior aides to Bin Laden. Senior aides to Bin Laden subsequently met with Mughniyah on several occasions.

hh. The purpose of the meetings between Bin Laden, Al Qaeda, Hezbollah operatives, and Iranian agents was to share information on how to build a technologically advanced bomb that could destroy a building. Al Qaeda did not have the know-how, prior to its contacts with Hezbollah operatives and Iranian agents, to conduct the 1998 U.S. Embassy bombing at Nairobi, Kenya.

ii. Based on evidence developed in connection with the war in Afghanistan, senior officials in the U.S. Government, including then-Secretary of Defense Donald Rumsfeld,

believed that Al Qaeda and Taliban members had taken refuge in IRAN.

89. The officials, agents, and employees of the foreign sovereign Defendants were acting within the scope of their agency, office or employment when they provided support to the terrorists and terrorist group that destroyed the U.S. Embassy at Nairobi, Kenya. They did so because, for various reasons, it was the policy of their respective governments to aid Al Qaeda.

**D. The Events Leading Up to the Embassy Bombings**

90. In or about 1994, Mohamed Sadeek Odeh moved to Mombasa, Kenya, to set up businesses with Al Qaeda money, which was used to support Al Qaeda members in Kenya. While in Kenya, Odeh was visited by Muhammed Atef, the military commander of Al Qaeda.

91. In or about 1994, Wadih El Hage moved to Nairobi, Kenya, and established businesses and other organizations (*e.g.*, "Help Africa People") in Kenya.

92. While in Kenya, Wadih El Hage met repeatedly with one of Al Qaeda's military commanders, the late Abu Ubaidah al Banshiri.

93. On or about October 25, 1994, Khalid Al Fawwaz, a member of Al Qaeda, transferred the Kenyan business "Asma Limited" to the late Abu Ubaidah al Banshiri.

94. In or about 1996, in Mombasa, Kenya, Fahid Ali Msalam, a member of Al Qaeda, displayed explosives and detonators obtained in Tanzania to Mohamed Sadeek Odeh.

95. Beginning in the latter part of 1993, Anas Al Liby and other members of Al Qaeda began contemplating an attack against the U.S. Embassy in Nairobi, Kenya, in retaliation for the United States' participation in Operation Restore Hope in Somalia.

96. In or about the latter part of 1993, Anas Al Liby and others conducted a visual and photographic surveillance of the U.S. Embassy at Nairobi, Kenya.

97. In or about 1994, Anas Al Liby, together with other members of Al Qaeda reviewed files concerning possible terrorist attacks against: (i) the U.S. Embassy at Nairobi, Kenya; (ii) the building then housing the U.S. Agency for International Development in Nairobi, Kenya; and (iii) British, French and Israeli targets in Nairobi, Kenya.

98. In or about 1994, members of Al Qaeda also contemplated possible terrorist attacks against targets in various countries other than Kenya.

99. In or about 1994, Khalfan Khamis Mohamed traveled to an Al Qaeda camp in Afghanistan where he received training in explosives.

100. Beginning in or about 1996, Mohamed Rashed Daoud Al-'Owhali traveled to an Al Qaeda camp in Afghanistan where he received training in explosives, hijacking, kidnapping, assassination and intelligence techniques.

101. In or about 1996, following his training in a number of camps in Afghanistan affiliated with Al Qaeda, Mohamed Rashed Daoud Al-'Owhali met with Osama Bin Laden and asked him for a "mission."

102. In late February or early March 1997, Wadih El Hage, met and spoke with Mustafa Mohamed Fadhil, a member of Al Qaeda, and provided him with a new policy from Osama Bin Laden to militarize the East African cell of Al Qaeda.

103. On or about June 23, 1997, Wadih El Hage requested that $10,000.00 be transferred to an account in Kenya. On or about July 3, 1997, this money was transferred to an account in Kenya controlled by Wadih El Hage.

104. In or about March or April 1998, in Dar es Salaam, Tanzania, Khalfan Khamis Mohamed met with Mustafa Mohamed Fadhil, a member of Al Qaeda, and agreed to participate in a "jihad job."

105. In or about May 1998, Fazul Abdullah Mohamed, a member of Al Qaeda, rented a villa at 43 New Runda Estates in Nairobi, Kenya.

106. On or about May 4, 1998, Khalfan Khamis Mohamed applied for a Tanzanian passport in the name "Zahran Nassor Maulid."

107. In or about June 1998, Mohamed Rashed Daoud Al-'Owhali, and an individual known as "Azzam" filmed a videotape to celebrate their anticipated "martyrdom" in a bombing operation to be conducted against United States interests in East Africa.

108. On or about June 19, 1998, "Azzam," using a passport in the name of "Gihad Ali," traveled from Karachi, Pakistan, to Nairobi, Kenya.

109. In or about June 1998, Khalfan Khamis Mohamed and Fahid Ali Msalam purchased a white Suzuki Samurai ("the Suzuki Samurai") at a location in Dar es Salaam, Tanzania.

110. In or about June 1998, Khalfan Khamis Mohamed and Fahid Ali Msalam rented house number 213 in the Ilala District of Dar es Salaam, Tanzania.

111. In or about late June or early July 1998, Fahid Ali Msalam and Sheikh Ahmed Salim Swedan, a member of Al Qaeda, purchased a Toyota Dyna truck ("the Nairobi Bomb Truck") in Mombasa, Kenya, and made alterations to the back of the truck.

112. In or about July 1998, Ahmed Khalfan Ghailani, a member of Al Qaeda, and Sheikh Ahmed Salim Swedan, purchased a 1987 Nissan Atlas truck ("the Dar es Salaam

bomb truck") in Dar es Salaam, Tanzania.

113. In or about July 1998, Sheikh Ahmed Salim Swedan arranged for mechanical and welding work to be done on the Dar es Salaam bomb truck at various locations in Dar es Salaam, Tanzania.

114. In or about July 1998, Sheikh Ahmed Salim Swedan purchased two large truck batteries from a location in Dar es Salaam, Tanzania.

115. In or about July 1998, Ahmed Khalfan Ghailani and Fahid Ali Msalam purchased oxygen and acetylene tanks in Dar es Salaam, Tanzania.

116. On or about July 31, 1998, Mohamed Rashed Daoud Al-'Owhali, using a passport in the alias "Khaled Salem Saleh Bin Rashed," traveled from Karachi, Pakistan, to Nairobi, Kenya, arriving on August 2, 1998.

117. In or about late July 1998, in Dar es Salaam, Tanzania, Khalfan Khamis Mohamed, Mustafa Mohamed Fadhil, and others, participated in the grinding of TNT.

118. During the last week of July and the first week of August 1998, Mustafa Mohamed Fadhil, Khalfan Khamis Mohamed, and Fahid Ali Msalam met at the residence located at house 213 in the Ilala District of Dar es Salaam, Tanzania, to make final preparations for the bombing of the U.S. Embassy in Dar es Salaam, Tanzania.

119. In or about late July or early August 1998, Mustafa Mohamed Fahil, Khalfan Khamis Mohamed, Fahid Ali Msalam, and Ahmed Khalfan Ghailani loaded boxes of trinitrotoluene ("TNT"), gas cylinder tanks, batteries, detonators, fertilizer, and sand bags into the back of the Dar es Salaam bomb truck.

120. On or about August 1, 1998, Abdullah Ahmed Abdullah, a member of Al Qaeda, advised Mohamed Sadeek Odeh that all members of Al Qaeda had to leave Kenya

by Thursday, August 6, 1998.

121. In or about early August 1998, Abdullah Ahmed Abdullah and Mohamed Sadeek Odeh traveled from Mombasa, Kenya, to Nairobi, Kenya.

122. During the first week of August 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed, and Mohamed Rashed Daoud Al-'Owhali, together with "Azzam" and other members of Al Qaeda, met at the villa located at number 43 New Runda Estates in Nairobi, Kenya, to make final preparations for the bombing of the U.S. Embassy at Nairobi, Kenya.

123. On or about August 1, 1998, Ahmed Khalfan Ghailani checked into the Hilltop Hotel in Nairobi, Kenya. On or about August 2, 1998, Mohamed Sadeek Odeh and Fazul Abdullah Mohammed, together with other members of Al Qaeda, met at the Hilltop Hotel in Nairobi, Kenya.

124. On or about August 2, 1998, Sheikh Ahmed Salim Swedan and Mustafa Mohamed Fadhil left Nairobi, Kenya, for Karachi, Pakistan.

125. On or about August 3, 1998, Fahid Ali Msalam purchased air travel tickets to Pakistan for himself and Mohamed Sadeek Odeh.

126. On or about August 4, 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed and Mohamed Rashed Daoud Al-'Owhali, together with "Azzam" and other members of Al Qaeda, reconnoitered the U.S. Embassy at Nairobi, Kenya.

127. On or about August 6, 1998, Abdullah Ahmed Abdullah and Ahmed Khalfan Ghailani left Nairobi, Kenya, for Karachi, Pakistan.

128. On or about August 6, 1998, Mohamed Sadeek Odeh and Fahid Ali Msalam left Nairobi, Kenya, for Karachi, Pakistan.

**E. The Bombing at the U.S. Embassy in Nairobi, Kenya**

129. On August 7, 1998, at approximately 9:30 a.m. local time, Fazul Abdullah Mohammed drove a pick-up truck from the villa located at 43 New Runda Estates to the vicinity of the U.S. Embassy in Nairobi, Kenya. Meanwhile, Mohamed Rashed Daoud Al-'Owhali rode in the Nairobi Bomb Truck driven by "Azzam" (a Saudi national) containing a large bomb to the U.S. Embassy at Nairobi, Kenya. Mohamed Rashed Daoud Al-'Owhali possessed four stun-type grenades, a handgun, bullets, and keys to the padlocks on the Nairobi bomb truck.

130. On August 7, 1998, at approximately 10:30 a.m., Mohamed Rashed Daoud Al-'Owhali got out of the Nairobi bomb truck as it approached the rear of the U.S. Embassy building and threw a stun grenade in the direction of a security guard before attempting to flee.

131. On August 7, 1998, at approximately 10:30 a.m., "Azzam" drove the Nairobi bomb truck to the rear of the U.S. Embassy building and fired a handgun at the windows of the Embassy building.

132. On August 7, 1998, at approximately 10:30 a.m., "Azzam" detonated the explosive device contained in the Nairobi bomb truck at a location near the rear of the Embassy building, demolishing a multi-story secretarial college and severely damaging the U.S. Embassy building and the Cooperative Bank Building, causing a total of more than 213 deaths, as well as injuries to more than 4,500 people, including the Plaintiffs.

**F. The Bombing at the U.S. Embassy in Dar es Salaam, Tanzania**

133. In or about March 1998, Al Qaeda operatives Khalfan Khamis Mohamed ("Khalfan") and Mustafa Mohamed Fadhill ("Fadhill") met in Dar Es Salaam, Tanzania

and agreed to participate in a "jihad job".

134. On or about May 4, 1998, Khalfan applied for a Tanzanian passport in the name of Zahran Nassor Maulid.

135. In June 1998, Khalfan and Fahid Mohammed Ally Msalam ("Msalam") purchased a white Suzuki Samurai at a location in Dar es Salaam and rented a house in the Ilala District of Dar es Salaam, Tanzania.

136. Throughout the summer of 1998, Fadhill, Khalfan, Msalam, and Ahmed Khalfan Ghailani ("Ghailani") met at a residence on Amani Street in Dar es Salaam to discuss the bombing of the United States Embassy in Tanzania.

137. In or about July 1998, Ghailani and Ahmed Salim Swedan ("Swedan") purchased a 1987 Nissan Atlas truck in Dar es Salaam, Tanzania, arranged for mechanical and welding work on the truck, and purchased two large truck batteries, oxygen, and acetylene tanks.

138. In July 1998, Ahmed Mohamed Hamed Ali ("Ali") advised Mohamed Sadeek Odeh that Osama Bin Ladin had formed a united front with other Islamic extremist groups against the United States.

139. During the last week of July and first week of 1998, Fadhil, Khalfan, Msalam and another operative known as "Ahmed the German" (an Egyptian national) met at a residence in the Ilala District of Dar es Salaam to make final preparations for the bombing of the United States Embassy in Tanzania.

140. In July or August 1998, Khalfan, Msalam, Ghailani, Fadhil, and others loaded into the back of the 1987 Nissan Atlas truck boxes of trinitrotoluene ("TNT"), cylinder tanks, batteries, detonators, fertilizer and sand bags.

141. On or about August 7, 1998, Khalfan Khamis Mohamed accompanied "Ahmed the German" in the Dar es Salaam Bomb Truck during a portion of the ride to the U.S. Embassy.

142. At approximately 10:40 a.m. on August 7, 1998, "Ahmed the German" detonated an explosive device located within the 1987 Nissan Atlas in the vicinity of the United States Embassy in Dar es Salaam, Tanzania. The explosion severely damaged the United States Embassy and resulted in the deaths of at least 11 persons and injured at least 85 individuals.

143. Plaintiffs' and/or Plaintiffs' decedents' deaths and injuries were caused by a willful and deliberate act of terror by Al Qaeda, acting under direct and indirect sponsorship and/or direction, and with the direct material support and resources of the Defendants.

144. In the early hours, prior to the bombing, facsimiles were sent to London, England, claiming responsibility for the embassy bombings in the name of the "Islamic Army for the Liberation of the Holy Places", which claimed that the Dar es Salaam bombing was carried out by an Egyptian national.

145. Khalfan, Fadhil, Msalam, Ali, Ghailani, Swedan, and Ahmed the German were members of Al Qaeda and perpetrated the bombing of the United States Embassy in Dar es Salaam, Tanzania at the direction of and/or on behalf of Al Qaeda. Throughout August 7, 2008 and August 8, 2008, two Al Qaeda operatives, Adel Abdel Bary ("Bary") and Ibrahim Eidarous ("Eidarous"), participated in the dissemination of claims of responsibility for the bombings of the United States Embassies in Dar es Salaam.

146. The actions of the agents and co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, as set forth above, inflicted mental distress upon the Plaintiffs. The material support rendered to co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, fits within the definition of material support as described by 18 U.S.C. § 2339 (A).

147. The formation of Hezbollah and its emergence as a terrorist organization was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards, the Quds Force and the Iranian Ministry of Information. Al Qaeda was financed, technologically supported and/or commanded by Iranian military and intelligence operatives, including Hezbollah.

## CAUSES OF ACTION

## COUNT I

## CLAIM OF PLAINTIFF JOHN KABI KIBE

## WRONGFUL DEATH

(Under 28 U.S.C. § 1605A(c), U.S. state common law, Kenyan common law)

148. Plaintiff incorporates herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

149. FRANCIS KIBE, who died at the U.S. Embassy at Nairobi, Kenya, is survived by his son, JOHN KABI KIBE, who is entitled to recover damages resulting from the death of the decedent caused by the intentional and reckless acts, omissions, and other tortious conduct of the Defendants.

## COUNT II

## CLAIM OF PLAINTIFFS CALEB NDEDA CHOGO, STEPHEN MACHARIA, SAMUEL M. NJUGUNA, ANNE ODINGA, CANCILDE R. UMULISA, GEETA N. SHAH, AND DAVID AMAPANGA

## ASSAULT AND BATTERY

(Under 28 U.S.C. § 1605A(c), U.S. state common law,
Tanzanian common law, Kenyan common law)

150. Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

151. The actions of the Defendants caused and led directly to the 1998 embassy bombings. The bombing of the embassies intentionally and willfully put the surviving Plaintiffs in fear for their lives and apprehension of harm and injury as a direct result of fear of imminent death or mutilation.

152. The explosion was intended to cause (and did cause) harmful contact with the Plaintiffs and decedents at the bomb sites and put the Plaintiffs and decedents in reasonable apprehension of imminent battery. These injuries were caused by the willful and deliberate acts of persons acting with the purpose to inflict physical injuries upon the Plaintiffs and others, and by so doing, to intimidate the United States, and to cause its withdrawal from the Near East and Africa. Those persons were at all times acting with the material support of the Defendants and with the concurrence of the Defendants, the Islamic Republic of Iran, the Iranian Ministry of Information and Security, the Republic of the Sudan and the Ministry of the Interior of the Republic of the Sudan.

153. The personal injuries and losses suffered by the surviving Plaintiffs and decedents, and the consequences resulting therefrom, were proximately caused by the intentional and reckless acts, omissions, and other tortious conduct of all Defendants as

described herein.

**COUNT III**

**CLAIM OF ALL PLAINTIFFS**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR SOLATIUM**

(Under 28 U.S.C. § 1605A(c), U.S. state common law,
Tanzanian common law, Kenyan common law)

154. Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

155. The Defendants knew that the U.S. Embassy bombings would kill or injure innocent United States Plaintiffs and foreign Plaintiffs at their place of work, leaving family members to grieve for their loss.

156. As a direct and intended consequence of the intentional and reckless actions of the Defendants, the surviving Plaintiffs suffered severe mental distress, requiring continuing treatment that will continue for the balance of Plaintiffs' lives. Therefore Plaintiffs have suffered damages.

157. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will forever suffer severe and permanent emotional distress and anxiety, permanent psychological distress and permanent mental impairment.

158. The conduct of all Defendants was undertaken in an intentional manner to injure the Plaintiffs and to cause the contemporaneous and permanent emotional suffering of their immediate family members.

159. As a direct and proximate result of the death or injuries of the Plaintiffs, their family members have been deprived of their society, future aid, assistance, services, comfort, and financial support.

160. The Defendants, by engaging in this unlawful conduct, recklessly and/or intentionally inflicted severe emotional distress upon the Plaintiffs.

**COUNT IV**

**CLAIM OF ALL PLAINTIFFS**

**AIDING AND ABETTING**

(Under 28 U.S.C. § 1605A(c), U.S. state common law, Tanzanian common law, Kenyan common law)

161. Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

162. Defendants did knowingly and willfully provide substantial assistance to the terrorists and the terrorist organization that willfully and deliberately committed the two embassy bombings, which caused the injuries of the Plaintiffs. All Defendants were aware of the goals of Al Qaeda and were aware or should have been aware that the aid and assistance furnished to Al Qaeda would aid and abet Al Qaeda's terrorist activities, including the two U.S. embassy bombings.

163. For the reasons stated above, and having aided and abetted a terrorist organization which willfully and deliberately committed acts of terrorism which caused the injuries of the Plaintiffs, all Defendants are jointly and severally liable to the Plaintiffs for all damages in this civil action.

## COUNT V

## CLAIM OF ALL PLAINTIFFS

## CIVIL CONSPIRACY

(Under 28 U.S.C. § 1605A(c), U.S. state common law,
Tanzanian common law, Kenyan common law)

164. Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

165. As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to inflict personal injuries upon the Plaintiffs.

166. As set forth above, all Defendants conspired and agreed to provide material support and resources to Al Qaeda and the bombers, in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the U.S. Embassies in Dar es Salaam, Tanzania, and in Nairobi, Kenya.

167. The Defendants' conspiracy resulted in the August 7, 1998 Embassy attacks that severely injured, and/or inflicted personal injuries upon the Plaintiffs.

168. As a result of the Defendants' conspiracy, the Plaintiffs suffered damages as fully set forth in the paragraphs above and incorporated herein by reference.

## COUNT VI

## CLAIM OF ALL PLAINTIFFS

## PUNITIVE DAMAGES

(Under 28 U.S.C. § 1605A(c))

169. Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

170. As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to inflict personal injuries upon the Plaintiffs.

171. As set forth above, all Defendants conspired and agreed to provide material support and resources to Al Qaeda, and the bombers, in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the U.S. Embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya.

172. The Defendants' conspiracy resulted in the August 7, 1998 Embassy attacks that inflicted personal injuries upon the Plaintiffs.

173. The Defendants' outrageous actions cannot be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

174. As a result of the Defendants' conspiracy, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

## DAMAGES

175. As a direct and proximate result of the intentional, willful, reckless, and careless actions of the Defendants, the Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including the following:

(a) the severe mental anguish suffered by the Plaintiffs;

(b) the severe pain and suffering suffered by the Plaintiffs;

(c) the inability of the Plaintiffs to perform the usual household and personal activities that they normally would have performed through the remainder of their natural life expectancies;

(d) loss of the Plaintiffs' earnings and future earning potential;

(e) loss of the Plaintiffs' life's pleasures; and

(f) economic damages, solatium, pain and suffering, and punitive damages under 28 U.S.C. § 1605A(c).

176. The aforementioned personal injuries and losses incurred by the Plaintiffs were caused by the intentional outrageous acts, recklessness, and carelessness of all Defendants, acting individually and in concert, as well as other co-conspirators not yet identified, and of their agents, servants and/or employees acting within and during the course and scope of their employment, authority, or apparent authority.

177. These aggravating circumstances also justify the award of exemplary damages to the non-U.S. national Plaintiffs under Kenyan law.

178. Plaintiffs demand judgment in their favor in general damages against all Defendants, jointly, severally, and *in solido*, in an amount in excess of One Billion ($1,000,000,000.00) Dollars.

179. Plaintiffs also request an award of legal interest, costs, and such other relief as this Honorable Court deems appropriate.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that the Court grant judgment in their favor and against the Defendants, jointly, severally, and *in solido* on Counts One through Six, and grant to the Plaintiffs:

(a) Compensatory and punitive damages in favor of Plaintiffs and against Defendants jointly, severally, and *in solido,* in the amounts demanded in this Complaint for Damages;

(b) Prejudgment interest or other appropriate interest;

(c) Costs and expenses;

(d) Attorney's fees; and

(e) Such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

Respectfully submitted this 19th day of June 2015.

Respectfully submitted,

June 19, 2015 By: */S/ Raymond P. Boucher*

______________________________

Raymond P. Boucher (SBN 115364)
Nazareth M. Haysbert (SBN 294431)
Milin Chun (SBN 262674)
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, CA 91367
(818) 340-5400
(818) 340-5401 Fax
ray@boucher.la
*Pro Hac Vice* Admission Pending

By: */S/ Daniel S. Ward*

______________________________

Daniel S. Ward (DC Bar # 474339)
WARD & WARD, P.L.L.C.
2020 N Street, NW
Washington, DC 20036
(202) 331-8160
dan@wardlawdc.com

**ATTORNEYS FOR THE PLAINTIFFS**